UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————————————

LYNNEA WESLEY-DICKSON,

                              Plaintiff,            10 Civ. 2428 (JGK)

            - against -                             OPINION AND ORDER

WARWICK VALLEY CENTRAL SCHOOL
DISTRICT, ET AL.,

                              Defendants.
————————————————————————————————

JOHN G. KOELTL, District Judge:

        The plaintiff, Lynnea Wesley-Dickson, brings this action

against Warwick Valley Central School District (the "School

District"), Christine Fox, Marijane Reinhard, and Kathy Carmody

(collectively, the "defendants").  Defendants Fox, Reinhard, and

Carmody are allegedly sued in their individual and official

capacities.  The plaintiff, an African-American woman diagnosed

with cancer, was an employee of the School District, and alleges

that she was discriminated against on the basis of her race and

disability.

        The plaintiff brings claims against the defendants,

pursuant to Title VII of the Civil Rights Act of 1964 ("Title

VII"), 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981 ("Section

1981"); 42 U.S.C. § 1983 ("Section 1983"); the Americans with

Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; and

the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law

§ 296 et seq.  The defendants now move for summary judgment
dismissing all of these claims, pursuant to Rule 56 of the
Federal Rules of Civil Procedure.


## I.

The standard for granting summary judgment is well
established.  "The court shall grant summary judgment if the
movant shows that there is no genuine dispute as to any material
fact and the movant is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477
U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs.,
Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994).  "[T]he trial
court's task at the summary judgment motion stage of the
litigation is carefully limited to discerning whether there are
any genuine issues of material fact to be tried, not to deciding
them.  Its duty, in short, is confined at this point to issue-
finding; it does not extend to issue-resolution." Gallo, 22
F.3d at 1224.  The moving party bears the initial burden of
"informing the district court of the basis for its motion" and
identifying the matter that "it believes demonstrate[s] the
absence of a genuine issue of material fact." Celotex, 477 U.S.
at 323.  The substantive law governing the case will identify
those facts that are material and "[o]nly disputes over facts
that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.  Summary judgment is improper if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994).  If the moving party meets its burden, the nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible . . . ."
Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993).

## II.

The following facts are undisputed for the purposes of this motion, unless otherwise indicated.

The School District is a public K-12 school district. (56.1 Stmts.[1] ¶ 1.)  The plaintiff was hired by the School District in the summer of 2005 to fill a three-year probationary position as Supervisor of Special Education.  (56.1 Stmts. ¶ 2.) As Supervisor of Special Education, the plaintiff was responsible for overseeing the provision of services to the School District's special education students.  (56.1 Stmts. ¶ 3.)

The plaintiff's supervisor during her first year of probationary employment was Tammy Cosgrove, Director of Pupil Personnel Services (the "Director") for the School District. (56.1 Stmts. ¶ 6.)  The Director is required, among other things, to review annually the performance of the Supervisor of Special Education.  (56.1 Stmts. ¶ 7.)  For probationary employees, the Director's evaluation is used by the Superintendent of Schools in determining whether to recommend to the School District's Board of Education (the "Board") that the employee be awarded tenure at the end of the probationary term. (56.1 Stmts. ¶ 8.)

During the plaintiff's first year of probationary employment with the School District, Ms. Cosgrove counseled the

---

[1] "56.1 Stmts." refers to the Local Rule 56.1 Statement of Material Facts by the defendants together with the plaintiff's response.

plaintiff, both orally and in writing, about aspects of the
plaintiff's performance that needed improvement.  (56.1 Stmts.
¶ 9.)  On March 1, 2006, Ms. Cosgrove issued the plaintiff a
written letter, in which Ms. Cosgrove identified "ongoing
proofing and editing concerns" associated with the plaintiff's
work product.  (56.1 Stmts. ¶ 10.)

At the end of the 2005-2006 school year, Ms. Cosgrove
completed a performance evaluation for the plaintiff.  (56.1
Stmts. ¶ 11.)  The evaluation was generally positive, commending
the plaintiff for her strong interpersonal skills and personal
qualities, and stating that the plaintiff had "excellent
potential to be successful" in her position.  (Bryant Aff. Ex.
D.)  However, the evaluation also highlighted some serious
reservations that Ms. Cosgrove had.  (Bryant Aff. Ex. D.)

Ms. Cosgrove noted that the plaintiff needed to improve in
scheduling and holding meetings within mandated timelines.
(56.1 Stmts. ¶ 12.)  According to Ms. Cosgrove, "[d]espite
reminders and prompts from [Ms. Cosgrove], . . . secretaries as
well as the teachers themselves, Ms. Wesley-Dickson was, in
almost every case, unable to return observations within the 10-
day time frame specified in the teachers' contract.  Teacher
reactions to this situation ranged from sympathetic
understanding to anxious discomfort to outright annoyance."
(56.1 Stmts. ¶ 13.)

Ms. Cosgrove also noted that the plaintiff's support staff was "stepping in" to complete tasks that fell under the plaintiff's job description "in order to prevent parent outrage and service provider ire." (56.1 Stmts. ¶ 14.) Ms. Cosgrove went on to note that:

> By far the area in which the most concern exists for Ms. Wesley-Dickson's future success as an administrator lies in her writing skills. The Supervisor of Special Education position demands significant written output in many areas . . . . Basic writing skills such as organization, grammar and punctuation are lacking in Ms. Wesley-Dickson's final products. Proofing and editing skills appear limited, as does the ability to incorporate specific suggestions for addressing problem areas in writing samples . . . . All of these factors combine to cause grave concern with Ms. Wesley-Dickson's ability to adequately perform a major component of her job.

(Bryant Aff. Ex. D; 56.1 Stmts. ¶ 15.)

According to Ms. Cosgrove, "[t]he concerns with Ms. Wesley-Dickson's timeliness and writing skills are significant as they pose a real impediment to producing 'legally defensible documents'--the gold standard in the field of special education." (Bryant Aff. Ex. D; 56.1 Stmts. ¶ 16.) Ms. Cosgrove cautioned, "[s]hould gains in [the areas of timeliness and quality of written products] not be demonstrated, serious consideration should be given to the appropriateness of continuing on in such a writing-intensive position." (Bryant Aff. Ex. D; 56.1 Stmts. ¶ 17.)

In June 2006, Ms. Cosgrove left the Director position, and Kathleen Carmody was asked to serve as the Director on an interim basis.  (56.1 Stmts. ¶ 25.)  Ms. Carmody served as the Director until approximately September 2006, when the School District permanently appointed Elizabeth Kirnie as the Director. (56.1 Stmts. ¶ 27.)  After Ms. Kirnie resigned in December 2006, Ms. Carmody became the acting Director for the rest of the 2006-2007 school year.  (56.1 Stmts. ¶¶ 28-30.)

The plaintiff alleges that, in around December 2006, when she told Ms. Carmody that she needed to take absences for chemotherapy, Ms. Carmody stated that she had a colleague on chemotherapy who came to work very unkempt at times and was unable to remember anything.  (Wesley-Dickson Dep. at 86-90.) Ms. Carmody denies making any such statement to the plaintiff. (Carmody Aff. ¶ 8.)

On or about May 10, 2007, the plaintiff attended a meeting with the Superintendent of Schools at that time, Dr. Frank Greenhall.  (56.1 Stmts. ¶ 32.)  Superintendent Greenhall informed the plaintiff about the possibility that he would not recommend her for tenure.  (56.1 Stmts. ¶ 33.)

At some point in 2007, the plaintiff contacted her union representative, Ms. Mary Jane Hamburger, after receiving some negative memoranda about her work.  (Hamburger Dep. at 15.)  The plaintiff alleges that Ms. Hamburger advised Superintendent

Greenhall that the School District failed to follow its own policies with respect to the plaintiff, because the plaintiff had not received enough evaluations as guaranteed by her contract. (Hamburger Dep. at 16.)  The plaintiff alleges that Superintendent Greenhall told Ms. Hamburger in response that he was "not afraid to fire black people" and that he had already fired the School District's first black math teacher. (2d Am. Compl. ¶ 100.)  However, the plaintiff admits that she did not personally hear Superintendent Greenhall make these comments, and there is no admissible evidence of these comments. (56.1 Stmts. ¶¶ 81-82.)  Ms. Hamburger has no recollection of these comments, (Hamburger Dep. at 79-80), and Dr. Greenhall is now deceased, (Quesnel Oct. 26, 2012 Aff. ("Quesnel Aff.") ¶ 13).

On or about June 28, 2007, Superintendent Greenhall asked Ms. Carmody to create a professional evaluation for the plaintiff. (56.1 Stmts. ¶ 34.)  While supervising the plaintiff during the 2006-2007 school year, Ms. Carmody shared many of the same concerns that Ms. Cosgrove had with respect to the plaintiff's ability to perform competently the essential functions of her position.  In her evaluation, Ms. Carmody stated:

> As the Interim Director of Pupil Personnel Services from December 2006 through June 2007, I have had ample opportunity to observe, work with and supervise Lynnea Wesley-Dickson in her position as Supervisor of Special Education.

During this time Lynnea has demonstrated effectiveness in working with parents in person, face-to-face, and has proven adept at making them feel at ease during committee meetings. However, because of her poor organizational skills and failure to devote the extra time needed to insure the quality of her work, Lynnea's job performance fails to meet the high standards demanded by her position and which I sincerely believe she is capable of achieving. As a result, the timeliness and propriety of program assignments for some of our preschool students have suffered, angering parents and reflecting poorly on this office and Warwick Valley Central School District.

During this year's CSE/CPSE/Annual Reviews, Lynnea has sometimes appeared overwhelmed by the enormity of the tasks confronting her. I have often witnessed Lynnea's late filing of reports, inadequate background knowledge of available programs, insufficient preparation for Committee meetings, lack of attention to detail, late processing of STAC forms, failure to finalize IEPs in time for board approval and timely distribution to preschool programs (thereby forcing some students to start programs late), failure to return parents' repeated phone calls, and refusal to take responsibility for some problems largely of her own making. Preschools have been calling to inform us that IEPs are incomplete and/or incorrect. I have counseled Lynnea on numerous occasions regarding these shortcomings, but improvements in these areas have been marginal at best. Relatively simple advice like returning phone calls promptly has been largely ignored, although I suspect it is the lack of preparation for the ensuing conversation rather than a callous lack of respect for these parents that is behind her inaction. Regardless, this unresponsiveness, like the prevalence of the shortcomings detailed above, is unacceptable and should be addressed.

(Carmody Aff. Ex. A.)

During the late summer of 2007, Christine Fox was appointed Director and became the plaintiff's supervisor. (Fox Aff. ¶ 3.) From August 2007 through January 2008, Ms. Fox wrote six memoranda and letters of counsel to the plaintiff concerning various performance deficiencies of the plaintiff, and the plaintiff wrote responses to almost all of them. (Fox Aff. ¶¶ 4-10.)

Dr. Marijane Reinhard is the current Assistant Superintendent of Curriculum and Instruction Services for the School District, and has held this position since August 1999. (Reinhard Aff. ¶ 1.) The plaintiff alleges that on or about September 17, 2007, Dr. Reinhard told the plaintiff--an African-American woman wearing a head scarf at the time--that the plaintiff sounded "just like Aunt Jemima" when the plaintiff called her "Ms. Marijane." (2d Am. Compl. ¶ 36.) Dr. Reinhard admits telling the plaintiff that she "sound[ed] like Aunt Jemima," but claims the comment was made in response to the plaintiff's calling her "Ms. Marijane" in a southern accent. (Reinhard Aff. ¶ 4.) Dr. Reinhard claims that she was simply joking with the plaintiff, and that at the time she made the comment she did not understand that it would be offensive. (Reinhard Aff. ¶ 4.)

The plaintiff also alleges that approximately one week thereafter, Dr. Reinhard told the plaintiff that the plaintiff

"sounds like [she] was down on the plantation." (2d Am. Compl. ¶ 36.) Dr. Reinhard denies making such a comment or any comment similar to that. (Reinhard Aff. ¶ 4.) Dr. Reinhard also states that she was not the plaintiff's supervisor, did not review the plaintiff's performance, and had no input into any performance evaluations of the plaintiff. (Reinhard Aff. ¶ 3.)

Ms. Fox completed a performance evaluation for the plaintiff dated February 25, 2008. (Fox Aff. Ex. K.) In her evaluation, Ms. Fox identified concerns associated with the plaintiff's ability to perform her job competently. (Fox Aff. Ex. K.) The evaluation concluded:

> I have serious concerns over whether Ms. Wesley-Dickson is capable of the demands of this position . . . . I do not find Ms. Wesley-Dickson to possess any of the expected administrative skills at a level of satisfaction. Suggestions were made to attend workshops to improve some of these skills, however even after attending a few workshops and another year and a half of experience, Ms. Wesley-Dickson falls short of the expectations that the Warwick Valley Central School District and I have of its administrators.

(Fox Aff. Ex. K.)

In March 2008, Superintendent Greenhall informed the plaintiff that he would not recommend to the Board that the plaintiff be awarded tenure. However, Superintendent Greenhall offered the plaintiff an additional year of probationary employment. (2d Am. Compl. ¶¶ 65, 68.) The plaintiff alleges

that Superintendent Greenhall initially said to the plaintiff that this potential arrangement had nothing to do with her health, but that later in the conversation he inquired into her health and a couple days later asked her how her chemotherapy treatments were going. (Wesley-Dickson Dep. at 101.) The plaintiff accepted the additional year of probationary employment and did not file a grievance with her union. (Bryant Aff. ¶ 6; Wesley-Dickson Dep. at 97-98.)

Thereafter, the plaintiff's superiors continued to receive complaints about the plaintiff and noted deficiencies in her performance. On April 16, 2008, Ms. Fox issued a letter of counsel to the plaintiff after it was reported to Ms. Fox that the plaintiff was late to a meeting which the plaintiff was supposed to chair, and the plaintiff responded without denying her lateness. (Fox Aff. ¶ 13, Exs. L, M.) On May 13, 2008, Ms. Fox received a memorandum from one of the support staff complaining about the plaintiff's abusive conduct. (Fox Aff. ¶ 14.) On May 19, 2008, Ms. Fox issued a memorandum to the plaintiff, which identified specific directives the plaintiff was required to abide by going forward, and the plaintiff responded. (Fox Aff. ¶ 15.) On May 22, 2008, Superintendent Greenhall issued the plaintiff a letter of counsel concerning reports that the plaintiff had been late to meetings. (Bryant Aff. ¶ 13, Ex. G.)

On May 29, 2008, the School District received by mail a
copy of a complaint the plaintiff had filed with the Orange
County Human Rights Commission (the "Commission") on May 21,
2008, which was forwarded by the Commission to the New York
State Division of Human Rights ("NYSDHR") and received by the
NYSDHR on May 27, 2008.  (Quesnel Aff. ¶¶ 3-4, Exs. A, B.)  The
complaint contained allegations of racial discrimination and
disability discrimination.  (Quesnel Aff. Ex. B.)[2]

On June 19, 2008, Ms. Fox issued the plaintiff a letter of
counsel concerning the plaintiff's abusive treatment towards the
support staff.  (Fox Aff. ¶ 16.)  On August 8, 2008, Ms. Fox
prepared an evaluation of the plaintiff for the 2007-2008 school
year.  (Fox Aff. ¶ 17, Ex. R.)  The evaluation noted that "there
are still considerable concerns that continue, specifically the
ability to follow-through on cases and paying attention to the
details that come with each case."  (Fox Aff. Ex. R.)  The
evaluation concluded:

> Across the broad spectrum of responsibilities as
> an administrator Ms. Wesley-Dickson is not
> currently exhibiting the necessary skills in the
> areas of attention to detail and follow through
> that is expected by the Warwick Valley Central
> School District.  As an administrator it is
> imperative that a thread between cases continues

---

[2] The NYSDHR initially found probable cause for the plaintiff's
complaint.  However, on or about December 7, 2009, at the
plaintiff's request, the NYSDHR issued a Determination and Order
of Dismissal for Administrative Convenience.  (2d Am. Compl.
¶¶ 11-12.)

> through time and can not be looked upon as
> specific one-time tasks . . . .   All of these
> steps [in a thread] require constant attention
> and follow through in a timely manner.   This is
> not occurring even after numerous reminders to
> Ms. Wesley-Dickson over the past three years.
> Closer attention to details and follow through is
> a crucial job responsibility of the Supervisor of
> Special Education.   Ms. Wesley-Dickson has not
> demonstrated this skill and little improvement
> has been noted in the past school year.

(Fox Aff. Ex. R.)

The plaintiff alleges that Ms. Fox told the plaintiff the night before a mandatory diversity conference that Ms. Fox felt that the leaders, who were African-American, were a waste of her time and had no validity for her.  (Wesley-Dickson Dep. at 21-23.)  The plaintiff recalled no other comment by Ms. Fox about the plaintiff's race or the race of any other employees. (Wesley-Dickson Dep. at 29; Defs.' 56.1 Stmt. ¶ 92.)

In September 2008, the plaintiff received a memorandum from Ms. Fox concerning lack of communication and two letters of counsel from Superintendent Greenhall concerning insubordination and incomplete work and a complaint about the plaintiff from the District Transportation Department.  (Fox Aff. ¶ 18, Ex. S; Bryant Aff. ¶ 13, Exs. H and I.)  Also around September 2008, the plaintiff requested an extended medical leave of absence, which was granted by the School District.  (Bryant Aff. ¶ 6.)

In July 2009, the School District hired Dr. Raymond Bryant to act as Superintendent, (Bryant Aff. ¶ 1), following the

retirement of Dr. Greenhall, who died in August 2009 from
cancer.  (Quesnel Aff. ¶ 13.)  On August 5, 2009, the plaintiff
informed the School District by letter that she intended to
return to her position for the 2009-2010 school year.  (Bryant
Aff. ¶ 7, Ex. B.)  In her letter, the plaintiff expressed
concern about working under the supervision of Ms. Fox and Dr.
Reinhard, and requested alternative working conditions.    In
response to her letter, the School District assigned the
plaintiff a new supervisor, Assistant Superintendent for Human
Resources John Kolesar, provided her with a new office, and
allowed her to perform only a small portion of the
responsibilities required of the Supervisor of Special
Education.  (Bryant Aff. ¶ 7; Kolesar Aff. ¶¶ 3, 4, Ex. A.)

     On or about February 16, 2010, Mr. Kolesar wrote a
performance evaluation for the plaintiff.  In his performance
evaluation, Mr. Kolesar noted some concerns associated with the
plaintiff's work performance that were similar to concerns noted
in the plaintiff's prior performance evaluations.  (Kolesar Aff.
¶ 6, Ex. C.)

     In March 2010, the plaintiff was informed by Superintendent
Bryant that he would recommend to the Board that the plaintiff
not be awarded tenure.  (2d Am. Compl. ¶ 104.)  According to
Superintendent Bryant, he made this decision after concluding
that "Ms. Wesley-Dickson did not possess the skills and

attributes that are necessary for the highly demanding, detail oriented position of Supervisor of Special Education." (Bryant Aff. ¶ 8.)  When the plaintiff asked for a written statement of reasons for Superintendent Bryant's decision, Bryant provided a detailed written response. (Bryant Aff. Ex. C.)

In his response, Superintendent Bryant cited continued concerns about the accuracy of the plaintiff's written work product and her lack of attention to details, noting that the plaintiff's "inadequate writing skills have been a persistent problem since [she] began with the District, and [her] failure to improve those skills has been repeatedly identified to [her] without marked improvement." (Bryant Aff. Ex. C.) Superintendent Bryant's response concluded:

> In sum, as a four year employee, I expected to see progress in your abilities and did not expect that the errors would continue to occur.  As a long term employee, other administrators should not have to look over your shoulder to see if you are doing your job correctly.  Simply put, you have not met our expectations for the person we are looking to fill the position of Supervisor of Special Education.

(Bryant Aff. Ex. C.)

On April 26, 2010, the Board voted not to award the plaintiff tenure. (2d Am. Compl. ¶ 105.)  On May 31, 2010, the

plaintiff's probationary employment with the School District

ended by operation of the Education Law.  (56.1 Stmts. ¶ 72.[3])


### III.

The plaintiff brings claims against the defendants[4] pursuant

to Title VII, Section 1981, the ADA, the NYSHRL, and Section

1983.  The plaintiff alleges racial discrimination, hostile work

environment, and retaliation by the School District in violation

of Title VII.  Pursuant to Section 1981, the plaintiff alleges

racial discrimination, hostile work environment, and retaliation

by the School District, Fox, and Reinhard.[5]  The plaintiff

alleges disability discrimination by the School District, Fox,

and Reinhard in violation of the ADA.  Pursuant to the NYSHRL,

the plaintiff alleges discrimination and retaliation by the

defendants.  Pursuant to Section 1983, the plaintiff alleges

violations of her Fourteenth Amendment right to equal protection

by the School District, Fox, and Reinhard, as a result of the

alleged racial discrimination, hostile work environment, and

---

[3] While the plaintiff denies the materiality of this statement,
she does not dispute its accuracy.
[4] Dr. Greenhall is deceased and is no longer a defendant in this
case.  (Tr. of Oral Argument held on July 23, 2013, at 18.)
[5] The plaintiff concedes that she is not pursuing disability
discrimination under Section 1981.  Therefore, the plaintiff's
Section 1981 claim is limited to racial discrimination.  (Tr. of
Oral Argument held on Feb. 16, 2012, at 35.)

retaliation.[6]  The defendants now move for summary judgment on all of these claims, pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### A.

The plaintiff brings claims of racial discrimination pursuant to Title VII, Section 1981, and the NYSHRL.  Racial discrimination claims brought pursuant to Title VII, Section 1981, and the NYSHRL are governed at the summary judgment stage by the burden-shifting analysis established for Title VII claims in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Dawson v. Bumble & Bumble, 398 F.3d 211, 217 (2d Cir. 2005) (noting that the burden-shifting Title VII analysis also applies to discrimination claims under the NYSHRL); McLee v. Chrysler Corp., 109 F.3d 130, 134-35 (2d Cir. 1997) (applying the burden-shifting Title VII analysis to a Section 1981 claim).

To establish a prima facie case of discrimination under Title VII, a plaintiff must demonstrate: (1) that the plaintiff is a member of a protected class; (2) that the plaintiff was qualified for the job; (3) that the plaintiff suffered an adverse employment action; and (4) that the adverse employment

---

[6] The plaintiff concedes that she is not pursuing disability discrimination under Section 1983.  Therefore, the plaintiff's Section 1983 claim is limited to racial discrimination.  (Tr. of Oral Argument held on Feb. 16, 2012, at 35; Pl.'s Letter to the Court dated July 26, 2013, at 1.)

action occurred under circumstances giving rise to an inference of discrimination.  See McDonnell Douglas, 411 U.S. at 802; see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).

If the plaintiff meets the minimal burden of establishing a prima facie case, the burden of production then shifts to the defendant to offer a legitimate, non-discriminatory rationale for the adverse employment action.  See McDonnell Douglas, 411 U.S. at 802-03; see also Hicks, 509 U.S. at 506-07; Burdine, 450 U.S. at 254-55.  If the defendant articulates a legitimate reason for the action, the presumption of discrimination raised by the prima facie case drops out, and the plaintiff has the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision and that the plaintiff's membership in a protected class was.  See McDonnell Douglas, 411 U.S. at 804; see also Hicks, 509 U.S. at 507-08; Burdine, 450 U.S. at 255-56.

For a racial discrimination claim under Title VII, a plaintiff must demonstrate that race was at least "a motivating factor" for the adverse employment action.  See Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (quoting 42 U.S.C. § 2000e-2(m)) (internal quotation marks omitted).  "The ultimate burden of persuading the trier of fact that the defendant

intentionally discriminated against the plaintiff remains at all times with the plaintiff." Burdine, 450 U.S. at 253. "Though caution must be exercised in granting summary judgment [in discrimination cases] where intent is genuinely in issue, summary judgment remains available to reject discrimination claims in cases lacking genuine issues of material fact." Chambers, 43 F.3d at 40 (internal citation omitted).

1.

For purposes of this motion, the defendants concede that the plaintiff satisfies the first two elements of a prima facie case of racial discrimination: the plaintiff is African-American and thus a member of a protected class, and the plaintiff was qualified for her position at the time she was hired.

As for the third element, the defendants concede that the plaintiff suffered an adverse employment action in 2010, when the plaintiff was denied tenure and her probationary employment ended. (Defs.' Mem. Supp. Mot. Summ. J. at 13.) Nevertheless, the defendants argue that the plaintiff has not satisfied the fourth element, namely, that the adverse employment action occurred under circumstances giving rise to an inference of racial discrimination.

With respect to the 2010 decision not to award the plaintiff tenure, there is no evidence that this decision

20

occurred under circumstances giving rise to an inference of racial discrimination.  The decisionmakers were Superintendent Bryant and the Board, but there are no allegations of any racial hostility or racially discriminatory comments made by them.

The plaintiff also contends that Dr. Reinhard, Ms. Carmody, and Ms. Fox "all had substantial influence over the decision not to grant Plaintiff tenure."  (Pl.'s Letter to the Court dated July 26, 2013, at 2.)  However, there is no evidence in the record to support this contention with respect to Dr. Reinhard, and Ms. Carmody and Ms. Fox simply submitted performance evaluations for the plaintiff.

Even if Dr. Reinhard, Ms. Carmody, and Ms. Fox had any influence over the 2010 decision, there is still no evidence that the decision occurred under circumstances giving rise to an inference of racial discrimination.  The plaintiff alleges that Dr. Reinhard and Ms. Fox--but not Ms. Carmody--made some purportedly discriminatory comments on the basis of race.  The plaintiff alleges that, in September 2007, Dr. Reinhard said the plaintiff sounded "just like Aunt Jemima" and "sound[ed] like [she] was down on the plantation" (2d Am. Compl. ¶ 36), and that Ms. Fox told the plaintiff the night before a mandatory diversity conference that she felt the leaders, who were African-American, were a waste of her time and had no validity for her.  (Wesley-Dickson Dep. at 21-23.)

In determining whether a remark is probative of discriminatory intent, courts in the Second Circuit have considered four factors:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

Henry v. Wyeth Pharm., Inc., 616 F.3d 134, 149 (2d Cir. 2010) (collecting cases). "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination . . . . The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be." Id. (quoting Tomassi v. Insignia Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir. 2007)) (internal quotation marks omitted).

With respect to Dr. Reinhard's alleged comments, Dr. Reinhard was the Assistant Superintendent at the time, but she was not the plaintiff's supervisor and there is no evidence that she had any input into the decision as to whether the plaintiff would receive tenure. Dr. Reinhard's alleged comments were made in September 2007, whereas the decision not to award the plaintiff tenure was made in April 2010, more than two years

later. Although a reasonable juror could view Dr. Reinhard's alleged comments as racially discriminatory, there is no evidence that the comments were related to the decisionmaking process. In light of these factors, Dr. Reinhard's alleged comments do not constitute sufficient evidence to support a case of racial discrimination. See, e.g., Hawana v. City of New York, 230 F. Supp. 2d 518, 527 (S.D.N.Y. 2002) (holding that a single "stray remark" did not satisfy the fourth prong of a prima facie case); Campbell v. Alliance Nat'l Inc., 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote [from] the date of the decision.") (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992)).

With respect to Ms. Fox's alleged comment, Ms. Fox was the plaintiff's supervisor and submitted performance evaluations for the plaintiff, but she was not one of the ultimate decisionmakers for the 2010 decision. It is unclear from the record when exactly the alleged comment of Ms. Fox expressing impatience with attendance of a diversity conference was made. Nonetheless, the content of Ms. Fox's alleged comment was neutral--a reasonable juror could not view the comment as racially discriminatory when the comment simply evinces

annoyance for having to attend a mandatory conference.
Additionally, there is no evidence that Ms. Fox's alleged
comment was related to the decisionmaking process.  In light of
these factors, Ms. Fox's alleged comment does not constitute
sufficient evidence to support an inference of discrimination.
See, e.g., Hawana, 230 F. Supp. 2d at 527; Campbell, 107 F.
Supp. 2d at 247.

The plaintiff also contends that she suffered another
adverse employment action in 2008, when she was not recommended
for tenure but had her probationary employment extended, and the
defendants dispute this contention.  However, it is unnecessary
to reach the issue of whether the 2008 decision constitutes an
adverse employment action for purposes of the third element of a
prima facie case, because the plaintiff cannot satisfy the
fourth element of a prima facie case of racial discrimination
with respect to this decision.

The 2008 decision not to recommend the plaintiff for tenure
was made by Superintendent Greenhall.  The plaintiff contends
that Dr. Reinhard was also part of the decisionmaking process
with respect to the 2008 decision, (Pl.'s Letter to the Court
dated July 26, 2013, at 3), but there is no evidence in the
record of any input by Dr. Reinhard into that process.  Dr.
Reinhard was not the plaintiff's supervisor and did not write
any performance reviews.  Dr. Reinhard denies that she had any

input into the decision to extend the plaintiff's probationary

term for a year in 2008 or the decision to deny the plaintiff

tenure in 2010.  (Reinhard Aff. ¶ 3.)  There is no admissible

evidence of any racially discriminatory comments by Dr.

Greenhall or anyone else with input.  Accordingly, there is no

admissible evidence that the 2008 decision occurred under

circumstances giving rise to an inference of racial

discrimination.[7]

---

[7] The plaintiff also alleges that the numerous slights to her in
the workplace were adverse employment actions.  But, other than
the 2010 denial of tenure, and possibly the 2008 extension of
her probationary term for one year, the plaintiff has failed to
show that any of the other actions rose to the level of adverse
employment actions. As the Second Circuit Court of Appeals has
explained:

> A plaintiff sustains an adverse employment
> action if he or she endures a "materially
> adverse change" in the terms and conditions
> of employment.  To be "materially adverse" a
> change in working conditions must be "more
> disruptive than a mere inconvenience or an
> alteration of job responsibilities."  "A
> materially adverse change might be indicated
> by a termination of employment, a demotion
> evidenced by a decrease in wage or salary, a
> less distinguished title, a material loss of
> benefits, significantly diminished material
> responsibilities, or other indices . . .
> unique to a particular situation."

Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d
Cir. 2000) (internal citations omitted).  While Galabaya was
decided under the Age Discrimination in Employment Act of 1967,
29 U.S.C. § 621 et seq., the Court of Appeals noted that the
standard was the same under Title VII.  Galabya, 202 F.3d at 640
n.2; Patrolmen's Benevolent Ass'n. of City of New York v. City
of New York, 310 F.3d 43, 51 (2d Cir. 2002) (applying Galabya's
definition of adverse employment action in a Title VII claim);

In sum, the plaintiff only points to a few purportedly discriminatory comments allegedly made by Dr. Reinhard and Ms. Fox unrelated to the alleged adverse employment decisions, which are insufficient to raise an inference that the decisions about which the plaintiff complains were motivated by racial discrimination.  Because the plaintiff has not shown that either the 2010 decision or the 2008 decision occurred under circumstances giving rise to an inference of racial discrimination, the plaintiff has not met her burden of establishing a prima facie case of racial discrimination.

### 2.

In any event, the defendants have offered a legitimate, non-discriminatory reason for deciding not to award the plaintiff tenure in 2008 and in 2010, and the plaintiff has not demonstrated that this proffered reason was a pretext for a discriminatory motive on the basis of race.  The reason offered by the defendants was the plaintiff's history of performance problems during her period of probationary employment, especially with respect to her writing skills and attention to detail.  (Bryant Aff. ¶¶ 8-9, Ex. C.)

---

La Grande v. DeCrescente Distrib. Co., Inc., 370 F. App'x 206, 211 (2d Cir. 2010) (summary order) (same).

It is plain that the plaintiff had a history of performance problems by the time of both the 2008 and the 2010 decisions. During the 2005-2006 school year, Ms. Cosgrove counseled the plaintiff, both orally and in writing, about aspects of the plaintiff's performance that needed improvement, such as timeliness and writing skills, and noted those problems in her evaluation of the plaintiff. The plaintiff has not alleged that Ms. Cosgrove discriminated against the plaintiff. While supervising the plaintiff during the 2006-2007 school year, Ms. Carmody shared many of the same concerns that Ms. Cosgrove had with respect to the plaintiff's ability to perform her job competently. In her professional evaluation, Ms. Carmody noted the plaintiff's poor organizational skills and work quality, and that the plaintiff's job performance failed to meet the high standards demanded by her position. (Carmody Aff. Ex. A.) During the 2007-2008 school year, Ms. Fox issued several memoranda to the plaintiff specifically identifying performance deficiencies and recommended courses of action. (Fox Aff. ¶¶ 4-10.) In her performance evaluation for the plaintiff dated February 25, 2008, Ms. Fox identified concerns associated with the plaintiff's ability to perform her job competently. (Fox Aff. Ex. K.)

Even after the 2008 decision, the plaintiff's superiors continued to receive complaints about the plaintiff and noted

deficiencies in her performance.  Ms. Fox issued additional memoranda to the plaintiff about these complaints and deficiencies, and Superintendent Greenhall issued the plaintiff letters of counsel concerning, among other things, lateness for meetings, insubordination, and a complaint from the District Transportation Department.  (Fox Aff. ¶¶ 13-15; Bryant Aff. ¶ 13.)  Ms. Fox also issued the plaintiff a letter of counsel concerning the plaintiff's alleged abusive treatment towards the support staff, and later completed a negative evaluation for the plaintiff.  (Fox Aff. ¶ 16, Ex. R.)  In February 2010, Mr. Kolesar wrote a performance evaluation for the plaintiff, in which he noted some concerns associated with the plaintiff's work performance that were similar to concerns noted in the plaintiff's prior performance evaluations.  (Kolesar Aff. ¶ 6, Ex. C.)  There is no allegation that Mr. Kolesar made any discriminatory remarks or that he was involved in any of the prior events relating to the plaintiff, but he also noted the plaintiff's deficiencies.

In arguing that this proffered reason was a pretext for a discriminatory motive on the basis of race, the plaintiff only points to the comments allegedly made by Dr. Reinhard and Ms. Fox.  The plaintiff worked at the School District for approximately five years, but only points to a few purportedly discriminatory comments allegedly made by two separate people--

Dr. Reinhard, who had no input into the decisionmaking process,
and Ms. Fox, whose alleged comment was benign.  These comments
are insufficient to overcome the defendant's proffer of a non-
discriminatory reason for their actions--namely, the plaintiff's
poor performance.  The defendants' evidence includes complaints
and evaluations about the plaintiff's performance from people
whom the plaintiff has not accused of discrimination.  No
reasonable juror could conclude, on the basis of the evidence,
that the plaintiff's poor performance was a pretext for racial
discrimination or that race was a motivating factor in the
adverse actions taken against the plaintiff.  Campbell, 107 F.
Supp. 2d at 247; see also Burrell v. Bentsen, No. 91 Civ. 2654,
1993 WL 535076, at *8 (S.D.N.Y. Dec. 21, 1993) ("[S]tray remarks
in the workplace, statements by non-decisionmakers, and
statements by decisionmakers unrelated to the decisional process
are not by themselves sufficient to satisfy plaintiff's burden
of proving pretext.") (internal quotation marks and citation
omitted), aff'd, 50 F.3d 3 (2d Cir. 1995) (unreported table
decision).

Here, the plaintiff has not only failed to establish a
prima facie case of racial discrimination, but also failed to
demonstrate that the defendants' proffered non-discriminatory
reason for deciding not to award her tenure was a pretext for a
discriminatory motive on the basis of race.  In the absence of

sufficient evidence of racial discrimination and in the face of the strong non-discriminatory reason proffered by the defendants, no reasonable juror could find that discriminatory animus on the basis of race was a motivating factor in any adverse action taken against the plaintiff.  See Hawana, 230 F. Supp. 2d at 529; Campbell, 107 F. Supp. 2d at 247, 250-51. Therefore, the plaintiff's claims of racial discrimination must be dismissed.

## B.

The plaintiff brings claims of disability discrimination[8] pursuant to the ADA and the NYSHRL.  Disability discrimination claims brought pursuant to the ADA and the NYSHRL[9] are also governed at the summary judgment stage by the burden-shifting analysis established for Title VII claims in McDonnell Douglas, 411 U.S. at 802.  See, e.g., Dawson, 398 F.3d at 217 (NYSHRL);

---

[8] The Second Amended Complaint alleges that the School District, Fox, and Reinhard "took an adverse action against Plaintiff on account of Plaintiff's disability."  (Second Am. Compl. ¶ 173.) The plaintiff asserted at Oral Argument that there was also a failure-to-accommodate claim (Tr. of Oral Argument dated July 23, 2013, at 22-23), but no such claim was made in the Second Amended Complaint.

[9] Disability discrimination claims under the NYSHRL are governed by the same standards as those under the ADA, although the definition of disability is broader under the state statute. Behringer v. Lavelle Sch. for the Blind, No. 08 Civ. 4899, 2010 WL 5158644, at *7 n.4 (S.D.N.Y. Dec. 17, 2010) (citation omitted).

Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998) (ADA).

To establish a prima facie case of disability discrimination under these statutes, the plaintiff must demonstrate: (1) that her employer is subject to the statute; (2) that she is disabled within the meaning of the statute or is perceived to be so by her employer; (3) that she was otherwise qualified to perform the essential functions of her job with or without reasonable accommodation; and (4) that she suffered an adverse employment action because of her disability.  See Brady v. Wal-Mart Stores, 531 F.3d 127, 134 (2d Cir. 2008).

The remaining steps of the burden-shifting analysis for disability discrimination claims are the same as those for Title VII claims.  See McDonnell Douglas, 411 U.S. at 802-04; see also Hicks, 509 U.S. at 506-08; Burdine, 450 U.S. at 254-56.  For a disability discrimination claim under the ADA, a plaintiff must demonstrate that her disability was at least "a motivating factor" for the adverse employment action.  See Parker v. Columbia Pictures Indus., 204 F.3d 326, 336-37 (2d Cir. 2000) (holding that "the mixed-motive analysis available in the Title VII context applies equally to cases brought under the ADA");[10]

_____

[10] The holding in Parker, 204 F.3d at 336-37, which allows the mixed-motive analysis under the ADA, has been called into doubt in light of the Supreme Court's decision in Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009).  See Widomski v. State Univ.

see also <u>Perry v. NYSARC, Inc.</u>, 424 F. App'x 23, 25 (2d Cir. 2011) (summary order).

**1.**

For purposes of this motion, the defendants concede that the plaintiff, who was diagnosed with cancer, was "disabled" as defined by the ADA and the NYSHRL, and that the plaintiff was qualified for her position at the time she was hired.  (Defs.' Mem. Supp. Mot. Summ. J. at 11.)  The defendants also concede that the plaintiff suffered an adverse employment action in 2010, when the plaintiff was denied tenure and her probationary

---

of New York at Orange, --- F. Supp. 2d. ---, No. 09 Civ. 7517, 2013 WL 1155439, at *10 n.9 (S.D.N.Y. Mar. 20, 2013).  In <u>Gross</u>, the Supreme Court declined to extend the Title VII mixed-motive analysis to discrimination claims under the Age Discrimination in Employment Act (ADEA), and held that that a plaintiff alleging age discrimination must prove that "age was the 'but for' cause of the challenged employer decision." <u>Id.</u> at 177-78. Because the ADA and the ADEA contain parallel language prohibiting discrimination "because of" disability or age, several courts of appeals have extended the <u>Gross</u> holding to claims under the ADA and required a showing of "but-for" causation under the ADA. <u>Lewis v. Humboldt Acquis. Corp.</u>, 681 F.3d 312, 321 (6th Cir. 2012); <u>Serwatka v. Rockwell Automation, Inc.</u>, 591 F.3d 957, 962 (7th Cir. 2010); <u>Palmquist v. Shinseki</u>, 689 F.3d 66, 74 (1st Cir. 2012) (applying <u>Gross</u> to the Rehabilitation Act's retaliation provision, which explicitly incorporates the ADA's standard for liability).  The Second Circuit Court of appeals has not explicitly addressed the effect of <u>Gross</u> on an ADA claim. <u>Widomski</u>, 2013 WL 1155439 at *10 n.9. Nevertheless, it is unnecessary to reach the issue in this case, because, as explained below, the plaintiff has failed to carry her burden of persuasion even under the more lenient mixed-motive analysis, and thus would certainly not satisfy the more demanding "but-for" standard.  <u>Id.</u>

employment ended.  (Defs.' Mem. Supp. Mot. Summ. J. at 13.)
Nevertheless, the defendants argue that the plaintiff has not
satisfied the fourth element of a prima facie case of disability
discrimination: that the plaintiff suffered this adverse
employment action because of her disability.

      With respect to the 2010 decision not to award the
plaintiff tenure, there is no evidence that this decision
occurred under circumstances giving rise to an inference of
disability discrimination.  The decisionmakers were
Superintendent Bryant and the Board, and there is no evidence
that they were motivated by any discriminatory intent against
the plaintiff because of her disability.  There are, for
example, no allegations that they made any discriminatory
comments relating to a disability.

      Even if Dr. Reinhard, Ms. Carmody, and Ms. Fox had any
influence over the 2010 decision, as the plaintiff contends,
there is still no evidence that the decision occurred under
circumstances giving rise to an inference of disability
discrimination.  The plaintiff alleges that only Ms. Carmody
made a purportedly discriminatory comment on the basis of
disability.  When the plaintiff told Ms. Carmody in around
December 2006 that she needed to take absences for chemotherapy,
Ms. Carmody allegedly stated that she had a colleague on

chemotherapy who came to work very unkempt at times and was unable to remember anything.  (Wesley-Dickson Dep. at 86-90.)

In determining whether Ms. Carmody's alleged comment is probative of discriminatory intent, the Court considers the factors explained in Henry, 616 F.3d at 149.  Here, Ms. Carmody was the plaintiff's supervisor and submitted an evaluation for the plaintiff, but she was not one of the ultimate decisionmakers for the 2010 decision.  Ms. Carmody's alleged comment was made in around December 2006, whereas the decision not to award the plaintiff tenure was made in April 2010, more than three years later.  Ms. Carmody had ceased to be the plaintiff's supervisor, and the plaintiff was subsequently supervised by Ms. Fox and Mr. Kolesar, who both provided negative evaluations of the plaintiff but as to whom there is no evidence of discrimination based on disability.  Although a reasonable juror could view Ms. Carmody's alleged comment as discriminatory, there is no evidence that the comment was related to the decisionmaking process.  In light of these factors, Ms. Carmody's alleged comment is insufficient to create an inference of disability discrimination.  See, e.g., Hawana, 230 F. Supp. 2d at 527; Campbell, 107 F. Supp. 2d at 247.

The plaintiff also contends that she suffered another adverse employment action in 2008, when she was not recommended for tenure but had her probationary employment extended, and the

defendants dispute this contention.  However, it is unnecessary
to reach the issue of whether the 2008 decision constitutes an
adverse employment action for purposes of the third element of a
prima facie case, because the plaintiff cannot satisfy the
fourth element of a prima facie case of disability
discrimination with respect to this decision.

The 2008 decision not to recommend the plaintiff for tenure
was made by Superintendent Greenhall.  In March 2008,
Superintendent Greenhall informed the plaintiff that he would
not recommend to the Board that she be awarded tenure, but
offered her an additional year of probationary employment.  (2d
Am. Compl. ¶¶ 65, 68.)  The plaintiff alleges that
Superintendent Greenhall initially said to the plaintiff that
this potential arrangement had nothing to do with her health,
but that later in the conversation he inquired into her health
and a couple days later asked her how her chemotherapy
treatments were going.  (Wesley-Dickson Dep. at 101.)

Superintendent Greenhall's alleged inquiries are not
probative of any discriminatory intent.  While Superintendent
Greenhall was the decisionmaker for the 2008 decision not to
recommend the plaintiff for tenure,[11] Greenhall's alleged

---

[11] The plaintiff contends that Dr. Reinhard was also part of the
decisionmaking process with respect to the 2008 decision (Pl.'s
Letter to the Court dated July 26, 2013, at 3), but there is no
evidence in the record to support this contention.

inquiries were made during and after his meeting with the
plaintiff in March 2008: by that time, he had already indicated
to the plaintiff at a meeting in May 2007 that it was possible
he would not recommend her for tenure.  (56.1 Stmts. ¶¶ 32-33.)
Furthermore, the alleged inquiries were neutral questions about
the plaintiff's well-being that a reasonable juror could not
view as discriminatory.  There is also no evidence that
Superintendent Greenhall's alleged inquiries were related to the
decisionmaking process.  In light of these factors,
Superintendent Greenhall's alleged inquiries are insufficient to
raise an inference of disability discrimination.  See, e.g.,
Hawana, 230 F. Supp. 2d at 527; Campbell, 107 F. Supp. 2d at
247.

In sum, the plaintiff only points to a couple of
purportedly discriminatory comments allegedly made by Ms.
Carmody and Superintendent Greenhall that do not constitute
sufficient evidence to support an inference of disability
discrimination.  Because the plaintiff has not shown that
disability discrimination was a motivating factor in either the
2010 decision or the 2008 decision, the plaintiff has not met
her burden of establishing a prima facie case of disability
discrimination.

2.

Moreover, the defendants have offered a legitimate, non-discriminatory reason for deciding not to award the plaintiff tenure, and the plaintiff has not demonstrated that this proffered reason was a pretext for a discriminatory motive on the basis of disability.  The reason offered by the defendants was the plaintiff's history of performance problems during her period of probationary employment, especially with respect to her writing skills and attention to detail.  As explained above, the plaintiff had a history of performance problems by the time of both decisions, which supports the defendants' proffered reason for deciding not to award her tenure.

In arguing that this proffered reason was a pretext for a discriminatory motive on the basis of disability, the plaintiff only points to the comments allegedly made by Ms. Carmody and Superintendent Greenhall.  The plaintiff worked at the School District for approximately five years, but only points to a couple of purportedly discriminatory comments allegedly made by two separate people--Ms. Carmody, whose comment was unrelated to the 2010 decision made over three years later, and Superintendent Greenhall, whose alleged inquiries were benign. As explained above, these comments do not constitute sufficient evidence to overcome the defendants' showing that there was a legitimate non-discriminatory reason for the District's action,

namely, the plaintiff's poor performance.  See, e.g., Campbell,
107 F. Supp. 2d at 247; see also Burrell, 1993 WL 535076, at *8.

     Here, the plaintiff has not only failed to establish a
prima facie case of disability discrimination, but also failed
to demonstrate that the defendants' proffered non-discriminatory
reason for deciding not to award her tenure was a pretext for a
discriminatory motive on the basis of disability.  In the
absence of sufficient evidence of disability discrimination and
in the face of the strong non-discriminatory reason proffered by
the defendants, no reasonable juror could find that
discriminatory animus on the basis of disability was a
motivating factor in any adverse action taken against the
plaintiff.  See Hawana, 230 F. Supp. 2d at 529.  Therefore, the
plaintiff's claims of disability discrimination must be
dismissed.


                                C.

     The plaintiff brings claims of hostile work environment
pursuant to Title VII and Section 1981.[12]  A plaintiff may bring
a separate cause of action under Title VII for hostile work

---

[12] The plaintiff does not explicitly allege that she was
subjected to a hostile work environment on the basis of
disability in violation of the ADA.  However, for reasons
explained below, the Court will assume that the plaintiff's
claims include a claim of hostile work environment on the basis
of disability.

environment, and this cause of action has also been recognized under Section 1981 and the NYSHRL.  See Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 723-24 (2d Cir. 2010) (Section 1981); Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 609 (2d Cir. 2006) (NYSHRL).  The Second Circuit Court of Appeals has not yet decided whether the ADA provides a basis for a hostile work environment claim.  See Margherita v. FedEx Express, 511 F. App'x 71, 73 (2d Cir. 2013) (summary order). For purposes of this motion, the Court will assume that a hostile work environment claim is cognizable under the ADA and will evaluate the plaintiff's hostile work environment claim on the basis of disability under the Title VII standard.  See Forgione v. City of New York, No. 11 Civ. 5248, 2012 WL 4049832, at *7 n.6 (E.D.N.Y. Sept. 13, 2012) (noting that "[c]ourts which recognize hostile work environment claims under the ADA apply the same standard utilized in Title VII cases") (internal quotation marks and citation omitted).

To establish a prima facie case of hostile work environment, a plaintiff must show: (1) discriminatory harassment that was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) a specific basis exists for imputing the objectionable conduct to the employer.  Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (quoting

Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)) (internal
quotation marks omitted).  The plaintiff must show not only that
the plaintiff subjectively perceived the environment to be
abusive but also that the environment was objectively hostile
and abusive.  See Demoret v. Zegarelli, 451 F.3d 140, 149 (2d
Cir. 2006); Feingold v. New York, 366 F.3d 138, 150 (2d Cir.
2004).

     The first element of the prima facie case must be
established by a showing that "the workplace was so severely
permeated with discriminatory intimidation, ridicule, and insult
that the terms and conditions of [the plaintiff's] employment
were thereby altered."  Alfano v. Costello, 294 F.3d 365, 373
(2d Cir. 2002) (citation omitted).  "Isolated incidents
typically do not rise to the level of a hostile work environment
unless they are 'of sufficient severity' to 'alter the terms and
conditions of employment as to create such an environment.'"
Demoret, 451 F.3d at 149 (quoting Patterson v. Cnty. of Oneida,
375 F.3d 206, 227 (2d Cir. 2004)).  Generally, "incidents must
be more than episodic; they must be sufficiently continuous and
concerted in order to be deemed pervasive."  Id. (quoting
Alfano, 294 F.3d at 374) (internal quotation marks omitted).

     In analyzing a hostile work environment claim, courts
assess the totality of the circumstances, "considering a variety
of factors including 'the frequency of the discriminatory

40

conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23). Finally, although the Second Circuit Court of Appeals has cautioned that hostile work environment claims are "especially well-suited for jury determination," Schiano, 445 F.3d at 605 (internal quotation marks and citation omitted), "[i]t is axiomatic that mistreatment at work . . . is actionable under Title VII only when it occurs because of an employee's . . . protected characteristic," Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001).

### 1.

In this case, the plaintiff alleges that two discriminatory comments regarding her race were made. Specifically, the plaintiff alleges that Dr. Reinhard said the plaintiff sounded "just like Aunt Jemima" and "sound[ed] like [she] was down on the plantation." (2d Am. Compl. ¶ 36.) The plaintiff also alleges that Ms. Fox told the plaintiff the night before a mandatory diversity conference that she felt the leaders, who were African-American, were a waste of her time and had no validity for her. (Wesley-Dickson Dep. at 21-23.)

The plaintiff highlights various items that made her work life unpleasant, including her poor relations with her supervisors and the negative feedback about her job performance, but there is nothing linking those items to racial hostility. Although the plaintiff worked at the School District for approximately five years, she points to very few purportedly discriminatory comments and certainly not an environment that was severely permeated with racial discrimination. Neither of these alleged isolated incidents was of sufficient severity to alter the plaintiff's terms and conditions of employment and create an abusive work environment on the basis of racial discrimination. No reasonable jury could find that the plaintiff was subjected to a racially hostile work environment. See, e.g., Dabney v. Christmas Tree Shops, --- F. Supp. 2d ---, No. 10 Civ. 8734, 2013 WL 3820668, at *12 (S.D.N.Y. July 24, 2013); Risco v. McHugh, 868 F. Supp. 2d 75, 117 (S.D.N.Y. 2012); Davis-Bell v. Columbia Univ., 851 F. Supp. 2d 650, 670-74 (S.D.N.Y. 2012), appeal dismissed (Aug. 14, 2012); Dorrilus v. St. Rose's Home, 234 F. Supp. 2d 326, 334-35 (S.D.N.Y. 2002).

**2.**

In addition, the plaintiff alleges that two discriminatory comments regarding her disability were made. The plaintiff alleges that when she told Ms. Carmody that she needed to take

absences for chemotherapy, Ms. Carmody stated that she had a colleague on chemotherapy who came to work very unkempt at times and was unable to remember anything. (Wesley-Dickson Dep. at 86-90.) Dr. Greenhall also inquired about the plaintiff's health and how her chemotherapy treatments were going. (Wesley-Dickson Dep. at 101.)

These allegedly discriminatory comments certainly do not create an environment that was severely permeated with disability discrimination. These isolated incidents were not of sufficient severity to alter the plaintiff's terms and conditions of employment and create an abusive work environment on the basis of disability discrimination. See, e.g., Forgione, 2012 WL 4049832, at *7 (dismissing employee's hostile work environment claims under the ADA and the NYSHRL, despite his allegations that his supervisor made several offensive quips about his perceived disability).

The plaintiff also points to alleged unpleasant work experiences, but there is nothing about those alleged experiences that is linked to the plaintiff's disabilities. In fact, the plaintiff concedes that a number of accommodations were granted in light of her disability: she was afforded a medical leave of absence, provided with a different office and a different supervisor upon request, and was given an elevator pass. (Tr. of Oral Argument held on July 23, 2013, at 22-25.)

43

In this case, no reasonable jury could find that the plaintiff experienced a hostile work environment on the basis of either race or disability.  Therefore, the plaintiff's claims of hostile work environment must be dismissed.

### D.

The plaintiff brings claims of retaliation pursuant to Title VII, Section 1981, and the NYSHRL.[13]  Title VII, the ADA, and the NYSHRL contain anti-retaliation provisions that prohibit an employer from retaliating against an employee for opposing discriminatory conduct prohibited by the statutes.  See 42 U.S.C. § 2000e-3(a); 42 U.S.C. § 12203(a); N.Y. Exec. Law § 296(1)(e).  In addition, the Supreme Court has explained that Section 1981 "prohibits not only racial discrimination but also retaliation against those who oppose it."  Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2529 (2013) (citing CBOCS West, Inc. v. Humphries, 553 U.S. 442, 445 (2008)).

The anti-retaliation provisions in Title VII, the ADA, and the NYSHRL all contain nearly identical language and are governed by the same burden-shifting analysis.  See Sarno v.

---

[13] The plaintiff does not explicitly allege that she was retaliated against in violation of the ADA.  However, because the plaintiff's protected activity involved filing a complaint that alleged both racial discrimination and disability discrimination, (Quesnel Aff. Ex. B), the Court will assume that the plaintiff's claims include a claim of retaliation in violation of the ADA.

Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir.
1999) (noting that "it is appropriate to apply the framework
used in analyzing retaliation claims under Title VII in
analyzing a claim of retaliation under the ADA"); Kelly v.
Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C., 716 F.3d
10, 14 (2d Cir. 2013) ("The standards for evaluating . . .
retaliation claims are identical under Title VII and the
NYSHRL."). Retaliation claims are governed at the summary
judgment stage by the burden-shifting analysis established for
Title VII claims in McDonnell Douglas, 411 U.S. at 802. See
Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir.
2010).

Under the McDonnell Douglas framework, the plaintiff
carries the initial burden of establishing a prima facie case of
retaliation. See McDonnell Douglas, 411 U.S. at 802. "To
establish a prima facie case of retaliation, [the plaintiff]
must show that (1) she was engaged in protected activity;
(2) the employer was aware of that activity; (3) the employee
suffered a materially adverse action; and (4) there was a causal
connection between the protected activity and that adverse
action." Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir.
2012) (citations omitted). If the plaintiff meets this initial
burden, the defendant must point to evidence of a legitimate,
non-retaliatory reason for the challenged action. See Cifra v.

45

Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001).  If the
defendant meets its burden, then "the plaintiff must point to
evidence that would be sufficient to permit a rational
factfinder to conclude that the employer's explanation is merely
a pretext for impermissible retaliation."  Id.


### 1.

The defendants concede that the plaintiff engaged in
protected activity when she filed a complaint with the Orange
County Human Rights Commission on May 21, 2008, alleging racial
discrimination and disability discrimination.  (Defs.' Mem.
Supp. Mot. Summ. J. at 24.)  This protected activity occurred
after Superintendent Greenhall decided not to recommend her for
tenure in March 2008.  The School District became aware of the
plaintiff's protected activity on May 29, 2008, when it received
by mail a copy of the filed complaint.  The subsequent adverse
action occurred in April 2010, when the Board voted not to award
the plaintiff tenure.

The defendants contend that there is no evidence of any
causal relation between the denial of tenure in April 2010, and
the plaintiff's complaint of discrimination, which the District
received in May 2008.  There is no direct evidence of
retaliation.  There are, for example, no statements or documents
that reflect or suggest that there was a causal relationship

between the tenure decision and the prior complaint of
discrimination.

Even without direct evidence of causation, "a plaintiff can
indirectly establish a causal connection to support a . . .
retaliation claim by showing that the protected activity was
closely followed in time by the adverse [employment] action."
Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.,
252 F.3d 545, 554 (2d Cir. 2001) (internal quotation marks and
citation omitted); see also Summa v. Hofstra Univ., 708 F.3d
115, 127-28 (2d Cir. 2013); Cifra, 252 F.3d at 217.  The Supreme
Court recently held that "Title VII retaliation claims must be
proved according to traditional principles of but-for
causation," which "requires proof that the unlawful retaliation
would not have occurred in the absence of the alleged wrongful
action or actions of the employer."  Nassar, 133 S. Ct. at 2533.
However, the but-for causation standard does not alter the
plaintiff's ability to demonstrate causation at the prima facie
stage on summary judgment or at trial indirectly through
temporal proximity.

In this case, the only plausible adverse action subsequent
to the plaintiff's protected activity and thus relevant for her
retaliation claim was the 2010 decision not to award her

tenure.[14]  There is no direct evidence of a causal connection between the plaintiff's protected activity in May 2008 and this adverse action in April 2010.  Furthermore, the plaintiff cannot indirectly establish a causal connection to support her retaliation claim.  The Court of Appeals has not drawn a "bright line" to define the outer limits beyond which a temporal relationship between the exercise of a right and an allegedly retaliatory action is too attenuated.  See Gorman-Bakor, 252 F.3d at 554.  However, it is plain that the passage of almost two years between the May 2008 complaint and the April 2010 denial of tenure is too great to support a causal relationship.  See, e.g., Hawana, 230 F. Supp. 2d at 530 (passage of almost two years between the protected activity and the commencement of disciplinary charges was too great to suggest any causal

---

[14] The anti-retaliation provision of Title VII, the ADA, and state law are broader than workplace-related or employment-related retaliatory acts and harm, and extend to a challenged action that is "materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (internal citation and quotation marks omitted) (Title VII); Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (Title VII, § 1981, § 1983, and NYSHRL); Ragusa v. Malverne Union Free Sch. Dist., 381 F. App'x 85, 90 (2d Cir. 2010) (summary order).  While the plaintiff alleges additional actions against her, such as the imposition of certain additional responsibilities requiring her to coordinate certain examinations, and the failure by her co-worker to visit her while she was on a leave of absence, (Pl.'s Mem. in Opp. to Defs.' Mot. Summ. J. at 21-23), no reasonable juror could find that these actions were materially adverse to the plaintiff.  Moreover, there is no evidence that these actions were causally related to retaliation.

relationship between those two events); Castro v. Local 1199,
Nat'l Health & Human Servs. Employees Union, 964 F. Supp. 719,
729 (S.D.N.Y. 1997) (over a year is too long to show causal
relationship between filing an EEOC complaint and subsequent
firing).  Accordingly, the plaintiff has failed to establish a
prima facie case of retaliation.

## 2.

In any event, the defendants have offered a legitimate,
non-retaliatory reason for deciding not to award the plaintiff
tenure, and the plaintiff has not demonstrated that this
proffered reason was a pretext for impermissible retaliation.
The reason offered by the defendants was the plaintiff's history
of performance problems during her period of probationary
employment, especially with respect to her writing skills and
attention to detail.  (Bryant Aff. ¶¶ 8-9, Ex. C.)  As
previously discussed, it is plain that the plaintiff had a
history of performance problems by the time of the 2010
decision, which lends support to the defendants' proffered
reason for deciding not to award her tenure.

Here, the plaintiff has not only failed to establish a
prima facie case of retaliation, but also failed to demonstrate
that the defendants' proffered non-retaliatory reason for
deciding not to award her tenure was a pretext for impermissible

retaliation.   Therefore, the plaintiff's claims of retaliation
must be dismissed.


**E.**

Pursuant to Section 1983, the plaintiff alleges violations
of her Fourteenth Amendment right to equal protection, as a
result of the alleged racial discrimination, hostile work
environment, and retaliation.

In order to state a claim under Section 1983, a plaintiff
must allege a violation of a right secured by the Constitution
or laws of the United States and must show that the alleged
violation was committed or caused by a person acting under color
of state law.  See Feingold, 366 F.3d at 159 (quoting West v.
Atkins, 487 U.S. 42, 48 (1988)).  In this case, the plaintiff
alleges a violation of her Fourteenth Amendment right to equal
protection.

The plaintiff alleges that her constitutional right to
equal protection was violated as a result of the alleged racial
discrimination, hostile work environment, and retaliation.
"[Section] 1983 and the Equal Protection Clause protect public
employees from various forms of discrimination, including
hostile work environment and disparate treatment . . . ."
Demoret, 451 F.3d at 149.

50

The Second Circuit Court of Appeals applies the Title VII
burden-shifting analysis in determining whether conduct was
unlawfully discriminatory under Section 1983.  See Annis v.
Cnty. of Westchester, 136 F.3d 239, 245 (2d Cir. 1998) (citing
Hicks, 509 U.S. at 506 n.1 (assuming that the same burden-
shifting analysis applies to both Section 1983 and Title VII
claims of discrimination)).  Thus, where a plaintiff's Section
1983 claim parallels her Title VII claim, "[t]he elements of one
are generally the same as the elements of the other and the two
must stand or fall together."  Feingold, 366 F.3d at 159
(citations omitted).

As previously explained, the plaintiff's claims concerning
racial discrimination, hostile work environment, and retaliation
must be dismissed.  Because the plaintiff's Section 1983 claim
parallels these claims, her Section 1983 claim must also be
dismissed.


**F.**

Additionally, the defendants argue that all of the
plaintiff's claims against the District under the NYSHRL must be
dismissed as a matter of law because the plaintiff failed to
file a notice of claim with the District in compliance with the

51

requirements of New York State Education Law § 3813.[15]  The New

York State Court of Appeals has held that a party seeking to

commence an action against a public school district for alleged

violations of the NYSHRL must serve a verified notice of claim

on the governing body of the school district within three months

after accrual of such claim.  See Amorosi v. S. Colonie Indep.

Cent. Sch. Dist., 880 N.E.2d 6, 8 (N.Y. 2007) (quoting N.Y.

Educ. L. § 3813(1)).  Compliance with this requirement is a

condition precedent to suit.  See Putkowski v. Warwick Valley

Cent. Sch. Dist., 363 F. Supp. 2d 649, 653-54 (S.D.N.Y. 2005).

The defendants point out that the plaintiff never served a

verified notice of claim upon the School District's Board,

either directly or through its clerk, and the plaintiff does not

argue that she did so.  Instead, the plaintiff argues that the

act of filing a complaint with the Orange County Human Rights

_____

[15] New York Education Law § 3813(1) provides:

> No action or special proceeding, for any
> cause whatever, . . .  shall be prosecuted
> or maintained against any school district,
> . . . unless it shall appear by and as an
> allegation in the complaint or necessary
> moving papers that a written verified claim
> upon which such action or special proceeding
> is founded was presented to the governing
> body of said district . . . within three
> months after the accrual of such claim
> . . . .

Tort claims against a school district are excepted from the
notice requirements and must comply with the notice requirements
in New York General Municipal Law § 50-e.  See N.Y. Educ. Law
§ 3813(2).

Commission complies with Education Law § 3813 because it was served on the District. (See 2d Am. Compl. ¶ 10.)  However, the New York State Court of Appeals has held that the provisions of Education Law § 3813 requiring notification to the proper public body or official must be fulfilled in addition to providing sufficient information about the nature of the claim, and the failure to serve the proper public body with a notice of claim "is a fatal defect mandating dismissal of th[e] action." Parochial Bus Sys., Inc. v. Bd. of Educ. of City of New York, 458 N.E.2d 1241, 1245 (N.Y. 1983).

In this case, the plaintiff filed a complaint with the Orange County Commission of Human Rights, but she did not serve a verified notice of claim upon the School District's Board, either directly or through its clerk.  Because the plaintiff did not serve a verified notice of claim upon the requisite entity, the plaintiff has failed to comply with Education Law § 3813. See Amorosi, 880 N.E.2d at 8.  Accordingly, the plaintiff's claims against the District under the NYSHRL should be dismissed on that ground as well.

## CONCLUSION

It is undoubtedly true that the plaintiff has a sympathetic case in view of her unquestioned medical disability.  On the other hand, the District granted the plaintiff a leave of

absence and accommodated her wishes by transferring her and
providing her with a new supervisor after she returned from her
medical leave.  Ultimately, the District was faced with the
significant long-term decision, that is, whether to grant the
plaintiff tenure despite her documented history of performance
problems.  Under all the circumstances, no reasonable jury could
find that the denial of tenure, as well as the other actions
about which the plaintiff complains, were tainted by
discrimination or retaliation.

The Court has considered all of the arguments of the
parties.  To the extent not specifically addressed above, the
remaining arguments are either moot or without merit.  For the
foregoing reasons, the defendants' motion for summary judgment
is **granted.  The Clerk is directed to enter Judgment and to
close this case and all pending motions.**

SO ORDERED.

Dated:     New York, New York
           September 24, 2013            _____/s/_____
                                          John G. Koeltl
                                  United States District Judge

54